# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KAREN M. WELZEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-1887 (ESH) |
| | ) | |
| RICHARD BERNSTEIN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Karen M. Welzel has sued RB Associates ("RB"), her former employer; Richard Bernstein, the President and sole owner of RB; James Martens, the Executive Vice President and Chief Financial Officer of RB; and Crawford Sherman, the Vice President of Hotel Operations for RB. Plaintiff, who is white, alleges that she was subjected to a series of retaliatory acts following an incident when she responded critically to what she perceived as racial animus by her superior (James Martens), in violation of 42 U.S.C. § 1981 (Count I), and the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq.* ("DCHRA") (Count IV). Plaintiff also asserts retaliation claims against RB under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count II).[1] The matter comes before the Court on the parties' cross motions for summary judgment. For the reasons explained herein, the Court will grant defendants' motion, deny plaintiff's motion, and dismiss this case with prejudice.

---

[1] Although the amended complaint also contains claims for gender discrimination under Title VII and the DCHRA (Counts III and V), and for violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA") (Count VI), plaintiff has abandoned those claims. (*See* Memorandum in Support of Pl.'s Opposition to the Defs.' Motion for Summary Judgment, and in Support of Pl.'s Cross-Motion for Partial Summary Judgment ["Pl.'s Opp'n"] at 1-2.)

## BACKGROUND

RB is a real estate management and development company that manages commercial real estate, hotels, and a restaurant in Washington, D.C. and employees over 650 employees.  (Defs.' Statement of Material Facts ["Defs.' Stmt."] ¶ 1.)  Richard Bernstein, whose primary residence is in Fort Lauderdale, Florida, is the President and sole owner of RB.  (*Id.* ¶ 7; Bernstein Dep. at 11; 120-21.)  James Martens is the Executive Vice President and Chief Financial Officer of RB and is in charge of the day-to-day operations of the company.  (Defs.' Stmt. ¶¶ 10, 11; Deposition of James Martens, June 8, 2005 ["Martens Dep. I"] at 54; Bernstein Dep. at 64-65, 87.)  Crawford Sherman has served as RB's Vice President of Hotel and Restaurant Operations since mid-2002.  Prior to that time he was the General Manager of the Washington Plaza Hotel, which is one of the five hotels operated by RB.  (Defs.' Stmt. ¶¶ 12, 13; Sherman Dep., Ex. 1.)

Plaintiff was hired as RB's Director of Human Resources in October 1999.  (Defs.' Stmt. ¶ 14; Deposition of Karen M. Welzel, May 19, 2005 ["Welzel Dep. I"] at 54; Welzel Dep., Ex. 5.)  In that capacity, she was responsible for the human resource functions of the RB hotels, restaurants, and corporate staff.  (Defs.' Stmt. ¶ 15; Pl.'s Statement of Material Facts Not in Dispute ["Pl.'s Stmt."] ¶ 8.)  According to plaintiff, her job responsibilities included advising the management of RB regarding applicable employment laws and protecting the company from liability exposure.  (*See* Welzel Dep., Ex. 28 (letter from Karen Welzel to James Martens, dated Sept. 28, 2001); Welzel Dep. I ¶¶ 194-95; Welzel Dep., Ex. 57 (affidavit of Karen M. Welzel, Mar. 7, 2003, attached to EEOC charge of discrimination).)  From her first day of employment at RB on November 15, 1999 until December 2000, plaintiff reported directly to Wim Pastoor, the Vice President and Director of Hotel and Restaurant Operations at RB, and indirectly to Martens.

(Defs.' Stmt. ¶ 16; Deposition of Karen M. Welzel, May 23, 2005 ["Welzel Dep. III"] at 15-17;

Welzel Dep., Ex. 5.)  After Pastoor was terminated by RB in December 2000, plaintiff reported

directly to Martens.  (Defs.' Stmt. ¶¶ 87, 88; Deposition of James Martens, July 28, 2005

["Martens Dep. III"] at 364-65.)  From June 2002 until her termination on March 10, 2003,

plaintiff reported directly to Sherman, who had been elevated to Pastoor's position of Vice

President and Director of Hotel and Restaurant Operations during a reorganization of RB's hotel

management and operations.  (Defs.' Stmt. ¶¶ 124, 125; Welzel Dep., Ex. 45.)

       In late 1999 or early 2000, Pastoor proposed that RB create a central reservation office

("CRO") in the basement of the Washington Plaza Hotel.  (Declaration of Wim Pastoor, July 15,

2005 [Pastoor Decl. I"] ¶¶ 22, 23.)  Plaintiff participated in the creation and implementation of

the CRO.  (Deposition of Karen M. Welzel, May 20, 2005 ["Welzel Dep. II"] at 32.)  The CRO,

which was staffed primarily with reservation agents who previously had been working as

reservation agents at the five RB hotels, consisted primarily of African-American employees.

(Defs.' Stmt. ¶¶ 21, 24.)  Some time during the fall of 2000, during a training session for CRO

employees, Martens visited the basement area of the Washington Plaza Hotel to observe the CRO

space.  (*Id.* ¶ 25.)  He discovered that the basement had no windows, no ventilation, and no air

conditioning.  (*Id.* ¶ 26.)  Shortly thereafter, on November 22, 2000, plaintiff attended a meeting

with Martens and Pastoor.  While plaintiff and defendants dispute whether Martens' subsequent

comment was motivated by his observations of the uncomfortable working conditions at the

CRO, he did report that when he visited the area, he "saw two rows of black faces" looking at

him.  (Defs.' Stmt. ¶¶ 45; 51; Welzel Dep. I at 202, 203.)  To this, plaintiff responded: "Jim, be

careful how you say that."  (Pl.'s Stmt. ¶ 54.)

Although the parties dispute what transpired next, plaintiff contends that immediately after she "challenged his opinion" (Welzel Dep., Ex. 57), Martens stood up, closed the door to the conference room, and began to yell at her for approximately twenty minutes. (*See* Welzel Dep. III at 102-12.)  According to plaintiff, Martens told her that he "should be able to have these conversations behind closed doors at the corporate office." (*Id.* at 108.)  She asserts that Martens said that if RB paid more money for the position of reservation agent, RB would be able to get "a better class of people" and "employees from the state of Virginia" to fill that position.  (*Id.* at 103, 105, 106.).  Plaintiff further contends that Martens openly questioned whether RB had "the right person in the HR position" and threateningly told her that "he was not going anywhere." (*Id.* at 108, 109.)  During Martens' "tirade," plaintiff remained basically silent. (*See id.* at 112 ("I just let him go on for the twenty minutes that he was ranting.").)  She did, however, testify that "when I was able to get in a comment in all of his yelling at me, I did point out to him that we don't take the color of a person's skin into consideration when we're making hiring decisions." (*Id.* at 107.)[2]  Later that day, after the meeting had ended, plaintiff informed Martens that "I wasn't calling you a racist.  I was merely trying to tell you that the statements you were making were dangerous.  And I was just trying to caution you."  (Welzel Dep. III at 122.)

According to plaintiff, this November 22, 2000 meeting is "at the center of this case," and it is the "mainspring" that has "spawned a stream of additional retaliatory incidents that culminated with her firing" over two years later on March 10, 2003.  (Pl.'s Opp'n at 1, 5.) Plaintiff alleges that she was subjected to numerous adverse employment actions in retaliation for

---

[2] The testimony of the only witness -- Pastoor -- to the exchange between plaintiff and Martens is generally consistent with plaintiff's testimony.  (*See*, *e.g.*, Pastoor Decl. ¶¶ 38-43.)

her opposition to Martens' comments on November 22, 2000 and for several other protected activities that she allegedly engaged in during her tenure at RB.  (*See* Pl.'s Opp'n at 24-27 (listing alleged protected activities); *id.* at 28-30 (listing alleged adverse employment actions).)  She contends that the series of adverse employment actions began during the November 22, 2000 incident and culminated in her termination on March 10, 2003, which occurred three days after she filed an EEOC charge of discrimination on the basis of sex and retaliation.  (First Amended Compl., Ex. 6.)

Following her filing of an EEO complaint on March 7, 2003, and receipt of a right to sue letter on June 11, 2003, plaintiff initiated this suit.[3]  As the parties appear to agree, claims that arose after June 4, 2002 can be brought under Title VII and the DCHRA, but those that predate June 4 are barred by the statute of limitations and may only be brought under §1981, which has a four-year statute of limitations as applied to plaintiff's claims.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-83 (2004) (four-year statute of limitations for § 1981 claims created by 1991 Act).  (*See* Pl.'s Opp'n at 35 and Defs.' Reply to Pl.'s Opposition to Defs.' Motion for Summary Judgment and Opposition to Plaintiff's Cross Motion for Partial Summary Judgment ["Defs.' Reply"] at 11 n.12.)  Thus, according to the parties, retaliatory actions that occurred prior to May 2002 must be analyzed under § 1981, whereas those that arose after May 2002

_____

[3] On June 11, 2003, the EEOC sent plaintiff a right to sue notification together with a letter informing her that the Commission had dismissed her charge because "[t]here is insufficient evidence to support a claim that you were discriminated against because of your gender (Female) or that you were retaliated against in violation of Title VII [and] it is unlikely that further investigation would result in findings revealing violation of the statute."  (First Amended Compl., Ex. 1.)

should be analyzed under Title VII.[4]  (*Id.*)  Accordingly, before one can address the merits of the

parties' positions, it is necessary to set out the legal standards that will govern the Court's

analysis, as well as the controlling law under Title VII  and § 1981.[5]

## ANALYSIS

### I.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

where "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute as to

a material fact -- one that "might affect the outcome of the suit under the governing law" -- is

"genuine" if a reasonable jury could return a verdict in favor of the non-moving party.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A moving party is therefore entitled to

summary judgment against "a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial."  *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, the Court must draw every justifiable

---

[4] As demonstrated herein, it is likely that whether a claim is analyzed under Title VII or § 1981 is immaterial.

[5] Because the DCHRA is substantially similar to Title VII, courts look to Title VII jurisprudence, including the *McDonnell Douglas* burden-shifting test, when analyzing retaliation claims under the DCHRA.  *See Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 109 (D.D.C. 2002); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (standard for retaliation claims under DCHRA mirrors standard under Title VII).

inference in favor of the nonmoving party and accept that party's evidence as true, while

abstaining from credibility determinations and any weighing of the evidence. *Anderson,* 477

U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320,

325 (D.C. Cir.1989).  The nonmovant may not rely on unsupported allegations or denials, but

must offer affidavits or other competent evidence setting forth specific facts on which a

reasonable jury could find in her favor if summary judgment is to be avoided. *Greene v. Dalton*,

164 F.3d 671, 674-75 (D.C. Cir.1999).  "While summary judgment must be approached with

special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her

allegations by affidavits or other competent evidence showing that there is a genuine issue for

trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), *aff'd*

1999 WL 825425 (D.C. Cir. 1999) (internal citation omitted).

## II.     Legal Standard for Retaliation Claims Under Title VII

To establish a prima facie case for retaliation under Title VII, plaintiff must demonstrate

that she engaged in statutorily protected activity, that she suffered a materially adverse action,

and that a causal connection exists between the two. *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C.

Cir. 2003); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir.1984); *Black v. Tomlinson*, 425

F. Supp. 2d 101, 105 (D.D.C. 2006); *see also Burlington N. & Santa Fe R.R. Co. v. White*, __

U.S. __ , 2006 WL 1698958, at *10 (June 22, 2006) (applying the D.C. Circuit's analysis in

*Rochon v. Gonzales*, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006), to Title VII's anti-retaliation

provision to include not only actions affecting terms and conditions of employment, but also

employer actions that would have been materially adverse to a reasonable employee).  Plaintiff

bears the initial burden of proving each element of the prima facie case. *See McDonnell Douglas*

*v. Green*, 411 U.S. 792, 802 (1973) (concluding that the complainant carries the burden of demonstrating a prima facie case of racial discrimination).  If she succeeds, the burden shifts to defendants to articulate some legitimate, nondiscriminatory reason for their actions.  Their burden is only one of production, and they "need not persuade the court that [they were] actually motivated by the proffered reasons."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

If defendants are successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*."  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted).  At that point, plaintiff has the burden of persuasion to show that defendants' proffered nondiscriminatory reason was not the true reason for the employment decision.  *Burdine*, 450 U.S. at 256; *see also Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) ("[a]lthough the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (internal citations and quotation marks omitted).  "At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendants'] proffered reason was a pretext for [retaliation], summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

**III.     Availability of Cause of Action for Retaliation Under 42 U.S.C. § 1981**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42

U.S.C. § 1981(a).  Prior to the Supreme Court's decision in *Patterson v. McLean Credit Union*,

491 U.S. 164 (1989), several courts had held that § 1981 provides a cause of action for

employees who were retaliated against for engaging in activity protected by § 1981.  *See, e.g.*,

*Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 42-43 (2d Cir. 1984); *Goff v. Cont'l Oil Co.*,

678 F.2d 593, 598 (5th Cir. 1982); *Sester v. Novack Inv. Co.*, 638 F.2d 1137, 1146 (8th Cir.

1981); *Cox v. Consol. Rail Corp.*, 557 F. Supp. 1261, 1264-66 (D.D.C. 1983).  In *Patterson*,

however, the Supreme Court held that the "make and enforce contracts" language of § 1981

encompassed discrimination in contract formation but *not* contract performance.  *See* 491 U.S. at

179.  Applying *Patterson*, several courts concluded that retaliation claims -- which involve

conduct subsequent to contract formation -- were not actionable under § 1981.  *See, e.g.*, *Carter*

*v. S. Cent. Bell*, 912 F.2d 832, 840-41 (5th Cir. 1990); *Sherman v. Burke Contracting, Inc.*, 891

F.2d 1527, 1535 & n. 17 (11th Cir. 1990).

In response to *Patterson* and its progeny, Congress included in the Civil Rights Act of

1991 (the "1991 Act"), Pub. L. No. 102-166, 105 Stat. 1071, a new subsection that defines the

phrase "make and enforce contracts" for § 1981 purposes.  That subsection provides that "'make

and enforce contracts' includes the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship." 42 U.S.C. § 1981(b).  In the aftermath of the 1991 Act, the majority of circuits that

have addressed the issue have adopted the general proposition that retaliation claims are

actionable under § 1981.[6]  *See, e.g., Hawkins*, 163 F.3d at 693; *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir.1998); *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259 (8th Cir. 1996); *but see Hart v. Transit Mgmt. of Racine, Inc.*, 426 F.3d 863, 866 (7th Cir. 2005) (§ 1981 "does not include a prohibition against retaliation for opposing racial discrimination"). For its part, the D.C. Circuit has "assume[d] without deciding" that a retaliation claim may be cognizable under § 1981.  *Carney v. American Univ.*, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998).

Moreover, several courts have held -- both before and subsequent to the passage of the 1991 Act -- that non-minority plaintiffs may bring an action under § 1981 against a party who has retaliated against them because they objected to that party's racially discriminatory practices. *See, e.g., Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir.1977) (white plaintiff properly stated a § 1981 claim where he alleged he was discharged because of his protest against a racially discriminatory discharge of a black co-worker); *McIntosh v. Bldg. Owners and Managers Ass'n Int'l*, 355 F. Supp. 2d 223, 226 (D.D.C. 2005) (white plaintiff properly stated § 1981 claim where he alleged he was fired for protesting the treatment of African-American co-

---

[6] A number of courts that have done so have reasoned that the 1991 Act's legislative history supports the view that the broad definition of "make and enforce contracts" is intended to encompass race-based retaliation claims.  Specifically, the House Committee Report states that the Committee:

> intends this provision to bar all race discrimination in contractual relations. The list set forth in subsection (b) is intended to be illustrative rather than exhaustive. In the context of employment discrimination, for example, this would include, but not be limited to, claims of harassment, discharge, demotion, promotion, transfer, *retaliation,* and hiring.

*Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) (quoting H.R. Rep. No. 102-40(I), at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 630 (emphasis added)).

workers); *Glymph v. Dist. of Columbia*, 211 F. Supp. 2d 152, 154-57 (D.D.C. 2002) ("[T]he race-based activity must lie in the protected activity, not in the race of the plaintiff.").[7]  This result is, however, far from uniform.  For example, in a recent Seventh Circuit case, a unanimous panel held that unlike Title VII, which makes it unlawful for an employer to discriminate against an employee for opposing a practice made unlawful by the Act, § 1981 "encompasses only racial discrimination on account of the plaintiff's race and does not include a prohibition against retaliation for opposing racial discrimination."  *Hart*, 426 F.3d at 866.

In those instances, however, where courts have recognized a cause of action under § 1981 for retaliation, they have used Title VII's framework to analyze those claims.  *See, e.g., Taitt v. Chem. Bank*, 849 F.2d 775, 777 (2d Cir. 1988).  Thus, whether the claim is brought under Title VII or § 1981, a plaintiff still must demonstrate that she engaged in protected activities, that she suffered a materially adverse action, and that these exists a causal connection between the two. *Carney*, 151 F.3d at 1095; *see also Rochon*, 438 F.3d at 1217-18.

**IV.   What is Protected Activity Within the Meaning of Title VII and § 1981?**

Whether one proceeds under Title VII or § 1981, it is clear that plaintiff must first

---

[7] Similarly, numerous courts have permitted non-minority plaintiffs to bring an action under § 1981 against parties who have retaliated against them because they refused to engage in purposeful racial discrimination in a contractual or marital context. *See, e.g., Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1007 (11th Cir. 1998) (indicating that plaintiffs' § 1981 retaliation claim may proceed based on plaintiffs' allegations that they were fired for refusing to participate in employer's discrimination against non-white customers); *Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114 (5th Cir. 1986) (allowing § 1981 suit by white female alleging she was discharged because her husband was Iranian), *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986) (white male alleging he was not hired because his wife was black); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir. 1975) (white person alleging he was forced into retirement because he had sold his house to a black person), *modified on other grounds*, 520 F.2d 409 (2d Cir. 1975).

demonstrate as part of her prima facie case that she engaged in statutorily protected activity.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any

individual, or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's anti-retaliation provision makes

it unlawful for an employer to discriminate against an employee for "oppos[ing] any practice

made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a) (the

"opposition clause"). In order to seek the protection of the opposition clause, plaintiff must be

able to "demonstrate a good faith, reasonable belief that the challenged practice violates Title

VII." *George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005); *see also Parker v. Baltimore and

Ohio R.R. Co.*, 652 F.2d 1012, 1019 (D.C. Cir. 1981). Title VII's anti-retaliation provision also

makes it unlawful for an employee to discriminate against an employee "because [s]he has made

a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (the "participation clause"). Therefore,

to satisfy the first prong of a prima facie case for retaliation under Title VII, plaintiff must

demonstrate that she engaged protected activity -- whether it be opposition or participation --

within the meaning of § 2000e-3(a).

While § 1981 may well incorporate Title VII's protections for both oppositional and

participatory protected activity engaged in by a white plaintiff, *but see Hart*, 426 F.3d at 866,

courts have recognized that the opposition clause of Title VII "is not identical to the kind of

discrimination proscribed by § 1981." *Little v. United Techs.*, 103 F.3d 956, 960-61 (11th Cir.

1997). At a minimum, courts agree that an act of retaliation for engaging in activity protected by

-12-

Title VII "does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981." *Hawkins*, 163 F.3d at 693.   Unlike Title VII, the pertinent part of § 1981 prohibits only purposeful racial discrimination in the making and enforcing of contracts.  *See Albert v. Carovano*, 851 F.2d 561, 572 (2d Cir. 1988) ("Section 1981 was intended to combat racial or ethnic discrimination, nothing more."); *Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 689 n.1 (8th Cir. 1997) (gender-based retaliation not cognizable under § 1981).  Accordingly, courts have held that § 1981 protects activities engaged in to vindicate the § 1981 rights of racial minorities, such as opposition to racially discriminatory employment practices.  *See McIntosh*, 355 F. Supp. 2d at 226.  However, the § 1981 "rights being vindicated by white plaintiffs must be identified with some particularity in order to limit actions under that statute to its purpose.  Otherwise, non-minority plaintiffs could bring actions where Section 1981 rights are not implicated." *Albert*, 851 F.2d at 572.  Thus, to satisfy the first prong of a prima facie case for retaliation under § 1981, plaintiff must demonstrate with some particularity that she attempted to vindicate the rights that are implicated by § 1981.

Applying these principles to the facts presented by plaintiff, as one must do at this stage, the Court will begin by analyzing the protected activities that plaintiff alleges that she engaged in to determine if her claims satisfy the requirements of § 1981 and/or Title VII.  In performing this analysis, the Court will assume, without deciding, that § 1981 encompasses a retaliation claim brought by a white plaintiff and that § 1981 incorporates the two types of protected activity defined by Title VII.  According to plaintiff, her protected activity occurred on: (A) November 22, 2000, when she told her superior to "watch what you say"; (B) January 4, 2001, when she made an internal complaint to Martens about Sherman's conduct toward her, and on January 16,

-13-

2001, when Martens chastised her for complaining about Sherman; (C) September 28, 2001,
when she wrote a three-page memo addressed to Martens in which she repeats her version of the
November 22, 2000 incident as part of her request for medical leave under the FMLA and for
workers' compensation benefits;[8] (D) June 17, 2002, when she responded by memo to
"Martens's Hostile Work Environment" (Pl.'s Opp'n at 26); (E) January 18, 2003, when she
"protest[ed] Sherman's disregard of civil rights of two workers" (*id.*); and (F) March 7, 2003,
when she filed an EEO complaint.  (*Id.* at 24-27).  According to plaintiff, incidents A, B, D and E
constitute oppositional activity and incidents C and F constitute participatory activity.  However,
with respect to incident C, plaintiff's careless attempt to cabin her workers' compensation and
FMLA request into Title VII's participation clause must be rejected.[9]  These are not proceedings
under Title VII, nor does plaintiff offer any case law (*see* Pl.'s Opp'n at 25) to support what can
only be viewed charitably as a fundamental misunderstanding of Title VII.  *See*, *e.g.*, *Parker*, 652
F.2d at 1019 ("[P]articipation clause . . . has . . . been interpreted as shielding recourse to the
EEOC."); *Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir. 1990) ("Accusations made in the
context of charges before the [EEOC] are protected by statute; charges made outside of that
context are made at the accuser's peril."); *Tuthill v. Consol. Rail Corp.*, No. 96-6868, 1997 WL
560603, at *3-4 (E.D. Pa. Aug. 26, 1997) ("In order to establish a claim under the 'participation

---

[8] Plaintiff delivered this memo to Bernstein and then went to see him about it in January
2002.  According to plaintiff, Bernstein did nothing in response to the memo.  (*See* Pl.'s Opp'n at
26.)

[9] As noted above, Title VII's participation clause makes it unlawful for an employer to
discriminate against an employee "because [s]he has made a charge, testified, assisted, or
participated in any manner *in an investigation, proceeding, or hearing under this subchapter*."
42 U.S.C. § 2000e-3(a) (emphasis added).

clause,' the investigation, proceeding, or hearing must fall within the confines of the procedures

set forth in Title VII . . . .").  Thus, the Court will proceed to address whether incidents A through

E constitute protected opposition activity within the meaning of § 1981 and/or Title VII.[10]

> ### A.      November 22, 2000

In a typically cavalier manner, plaintiff argues that "[b]y her statements and conduct,

[she] firmly opposed Martens' call for ridding the reservation staff of too many black faces, (a

euphemism for the more derogatory 'n' word) which is a practice that is unlawful under § 1981."

(Pl.'s Opp'n at 24.)  The problems with this assertion are many.  First, plaintiff attempts to draw

highly inflammatory inferences from Martens' statements, which simply do not withstand

scrutiny; second, under any reasonable interpretation of the facts, plaintiff's portrayal of her

conduct can hardly be characterized as "firmly opposed"; and finally, there is a serious question

whether Martens' conduct violated the law, but more importantly, plaintiff cannot satisfy the

legal requirements for sustaining a claim that she engaged in oppositional activity under § 1981.

To begin, plaintiff admits that she never received a directive regarding the hiring or firing

of African-American employees on November 22, 20002, or at any other time during her tenure

at RB.  (*See*, *e.g.*, Welzel Dep. I at 173-74, 203; Welzel Dep. II at 29-30; Welzel Dep. III at 235.)

In fact, there is *no* evidence in the record that Martens, or for that matter, anyone else at RB, ever

issued such a directive or that RB ever had a policy or practice regarding the hiring or firing of

African-American employees at the company's CRO.[11]  Furthermore, plaintiff conveniently

---

[10] Obviously, plaintiff's filing of a EEO complaint on March 7, 2003, satisfies § 2000e-3(a), and therefore, it qualifies as protected activity.

[11] It is undisputed that on November 22, 2000, the CRO, which was staffed primarily with reservation agents who previously had been working as reservation agents at the five RB hotels,

mischaracterizes what Martens said by suggesting that he said that he saw "too many black faces" in the CRO (Pl.'s Opp'n at 24; Welzel Dep., Ex. 28), when in fact, he said he saw "two rows of black faces." (Welzel Dep. I at 202-03.) She now admits that "too many black faces" was her "impression" or "understanding" of what Martens meant by what he said, and not what he actually did say. (Welzel Dep. I at 201-02; Welzel Dep. III at 98-100; Pl.'s Responses to Defs.' Statement of Material Facts Not in Dispute ¶ 53.) Plaintiff also offers no factual support whatsoever for her inflammatory allegation that Martens was using the reference to "black faces" as a euphemism for "the 'n' word." (Pl.'s Opp'n at 24.) Defendants vigorously challenge this allegation and correctly point out that "[t]here has not been one single allegation that 'the "n" word' was ever used by Defendants or anyone at RB Associates, or any testimony even to suggest that Martens used the term 'black faces' as a euphemism for 'the "n" word.'" (Defs.' Reply at 4.)

But not only does plaintiff's argument suffer from factual inaccuracies and unsupportable inferences, it also is legally flawed insofar as plaintiff has not shown that it was objectively reasonable for her to believe that she was opposing a practice that violated Title VII or attempting to vindicate the § 1981 rights of racial minorities. In plaintiff's own words, she simply "challenged" Martens' "opinion" by "caution[ing]" him on what he said behind closed doors at RB's corporate offices and how he said it. (Welzel Dep., Ex. 57; Welzel Dep. III at

---

was a racially diverse group consisting primarily of African-American employees. (Defs.' Stmt. ¶¶ 21, 24.) Ultimately, RB determined that the CRO was not working operationally, at which time the reservation agents were transferred back to their individual hotels. (*Id.* ¶ 31.) Plaintiff is aware of only one African-American reservation agent who was terminated subsequent to the November 22, 2000 incident, but she has testified that the individual was terminated for performance reasons. (*See* Welzel Dep. I at 174.) To this day, the majority of reservation agents at RB continue to be African-American. (*See* Defs.' Stmt. ¶ 24.)

122.)  *See Little*, 103 F.3d at 960-61 (plaintiff had no cause of action under either Title VII or § 1981 based on a claim that he was fired for complaining about a co-worker's racially derogatory comment).  In fact, other than instructing Martens to "be careful how you say that" (Pl.'s Stmt. ¶ 54), all that plaintiff did during the twenty minute meeting was remind Martens that "we don't take the color of a person's skin into consideration when we're making hiring decisions." (Welzel Dep. III at 107.)

And even if plaintiff's advice to Martens could be construed as oppositional activity, rather than performing her job as Director of Human Resources, plaintiff still has not shown that it was objectively reasonable for her to believe that she was opposing an employment practice that was violative of either Title VII or § 1981.  While one can certainly can take offense at the abusive nature of Martens' twenty-minute tirade, it is highly significant that his comments were *not* made in the presence of any African-American, and there is *no* evidence of any racially discriminatory policy or employment practice at RB.  At most, Martens may have demonstrated a racial animus to plaintiff, who is white, but there is no evidence to indicate that he engaged in any racially discriminatory practice *vis-à-vis* any African-American.

Nor can plaintiff salvage her claim by now arguing hostile work environment.  (*See* Pl.'s Reply at 17.)  Contrary to plaintiff's argument, whether or not a single incident can support a hostile work environment claim is simply irrelevant.  (*Id.*)  First, plaintiff has not raised a claim for retaliation based on a hostile work environment in either her complaint or her amended complaint.  *See Baloch v. Norton*, 355 F. Supp. 2d 246, 261 (D.D.C. 2005) (holding claim of

retaliation based on hostile work environment was not properly before the court).[12]  But more

importantly, even if an African-American could recover under § 1981 for Martens' comments,

plaintiff is *not* African-American.  And, although a white plaintiff may invoke § 1981, *see*

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295-96 (1976), plaintiff has *no* legal

basis to complain about derogatory comments about African-Americans made only in her

presence, since these remarks do not implicate rights covered by § 1981.  *See, e.g., Richardson v.*

*N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 440 (2d Cir. 1999) ("[T]o sustain a hostile work

environment claim . . . [plaintiff] must produce evidence that she was discriminated against

---

[12] It is also debatable whether plaintiff could even make out a hostile work environment claim given the Supreme Court's recent admonition in *White*:

> Title VII, we have said, does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998); *see Faragher* [*v. Boca Raton,* 524 U.S. 775, 788 (1998)] (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' "). An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See* 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson* [*v. Shell Oil Co.,* 519 U.S. 337, 346 (1997)]. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

__ U.S. __ , 2006 WL 1698958, at *10.

because of her [status].")*; Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) ("When

racial statements are not made directly to [protected class member], generally a hostile

environment cannot be established.") (citations omitted).

In short, for a host of reasons, plaintiff has failed to demonstrate a reasonable belief that

she was opposing practices made unlawful by § 1981 (or for that matter by Title VII).  *See*

*Leavitt*, 407 F.3d at 417; *Jordan v. Alternative Res. Corp.*, 447 F.3d 324, 331-34 (4th Cir. 2006)

(plaintiff could not have reasonably believed that he was objecting to hostile work environment

when he complained about a co-worker's racially offensive comment).  Nor has she

demonstrated with sufficient particularity that she was attempting to vindicate the § 1981 rights

of racial minorities.  *See Albert*, 851 F.2d at 572.  Thus, the Court must conclude that the incident

which serves as the catalyst for plaintiff's claims does not constitute protected activity, and thus,

"the centerpiece" of her case lacks any legal foundation.

**B.     January 5, 2001**

Plaintiff's next claim of oppositional activity occurred on January 2, 2001, when she met

with Sherman to discuss the staffing requirements in the reservation and sales departments of the

Washington Plaza Hotel.  (Pl.'s Ex. 155.)  The discussion was focused on plaintiff's efforts to

obtain a survey of the current going rates for reservation agents at Washington, D.C. hotels and

to recruit candidates to fill open sales manager positions.  (*Id.*)  In a memorandum to Martens

dated January 5, 2001, plaintiff characterized Crawford's behavior towards her during the

meeting as "impatien[t]," "rude," and "demanding." (*Id.*)  She indicated in the memorandum that

she felt that Crawford unjustifiably questioned her ability to do her job and that she was offended

by the manner in which he had spoken to her.  (*Id.*)  Plaintiff further noted that she had heard that

Crawford "felt the need to bring this subject up in front of the other General Managers," which jeopardized her working relationship with them.  (*Id.*; *see also* Welzel Dep. I at 219.)  In closing, plaintiff wrote:

> I am making an official complaint to you as the Senior Executive of this Company.  I found Crawford Sherman's personal attack of me in his office inexcusable and abusive.  I feel that his accounts of our conversation being discussed behind my back, without an opportunity to defend myself, to be totally unprofessional and bordering on harassment.  **I will not tolerate this kind of behavior.**  My service to this company has been exemplary.  I have gone beyond my role as a Corporate Director of Human Resources to provide the support and service that every employee deserves, yet I am being treated by him as a second rate employee . . . not with the respect due my position as a Corporate Director of Human Resources and as a human being.  I am formally asking you to take corrective action on this.  I would like your response in writing.

(Pl.'s Ex. 155 (emphasis in original).)  Plaintiff also contends that on January 16, 2001, she met with Martens to address the subject of her memorandum and that Martens told her that he would not consider her complaint against Crawford.  (Pl.'s Stmt. ¶¶ 218, 219; Declaration of Karen M. Welzel, Jan. 31, 2006 ("Welzel Decl. V") ¶ 35.)

Plaintiff characterizes these actions as "a complaint about violation of Welzel's civil rights."  (Pl.'s Opp'n at 32.)  As an initial matter, because plaintiff cannot state a gender discrimination claim under § 1981, she has no standing to complain about any violations of *her* civil rights.  Moreover, plaintiff was not opposing civil rights violations.  Rather, she was complaining about what she perceived to be unprofessional and abusive behavior by Sherman and nothing more.[13]  Such activity is not protected under Title VII.  *See Higgins v. New Balance*

---

[13] As is clear from *White* (*see* note 12, *supra*), this arguably uncivil conduct would not qualify as sexual harassment within the meaning of Title VII.

*Athletic Shoe, Inc.*, 194 F.3d 252, 262 (1st Cir. 1999) (no protected activity where plaintiff

complained of supervisor's treatment but never stated a belief that it violated Title VII or any

other law); *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (general

complaints about unfair treatment without alleging that employer engaged in unlawful

discriminatory conduct do not qualify as protected activity); *Thomas v. Ragland*, 324 F. Supp. 2d

950, 971-72 (W.D. Wis. 2005) (complaint about "inappropriate" behavior by supervisor, absent

allegation of sexual harassment or other discriminatory conduct, is not protected activity).

Therefore, plaintiff's January 5, 2001 memorandum and subsequent meeting with Martens do not

constitute protected activity under either § 1981 or Title VII.

### C.      September 28, 2001

On September 28, 2001, plaintiff filed a request for medical leave under the FMLA,

which Martens granted the same day.  (Pl.'s Stmt. ¶ 257; Defs.' Stmt. ¶ 100.)  Plaintiff also filed

a claim for workers compensation benefits with the District of Columbia Office of Workers'

Compensation on September 28, 2001.  (Welzel Dep., Ex. 29.)  At the time she filed this claim,

she was represented by the same counsel who represents her in the instant action.  (Welzel Dep. I

at 242.)  Attached to both was a memorandum to Martens in which plaintiff listed the several

causes of the "stress" for which she was seeking medical leave.  (Welzel Dep., Ex. 28.)  Included

was a description of the incident on November 22, 2000:

> You declared that there were too many "black faces looking back at
> him in the new Central Reservations Office."  When I tried to advise
> you that you may want to say that a little differently, you reacted
> violently, yelling at me and telling me that you should be able to say
> whatever you wanted behind closed doors.  You stated that I accused
> you of racism, and told me that you "never forget."  You also stated,
> in my face "I'm not going anywhere."  This was witnessed by Wim
> Pastoor.

(*Id.*)   Other causes of stress identified in the memorandum were plaintiff's impression that Martens had disfavored one unidentified job applicant because of his sexual orientation and another because of her appearance.  (*Id.*)  In closing, plaintiff wrote:

> I regret having to point out these issues, but as I said in the beginning, this type of behavior has put me as an H.R. professional in a compromising position that has caused me an incredible amount of stress.  The stress has manifested itself in physical and emotional ailments that have caused me to seek medical treatment.  Please consider my request.  (*Id.*)

Despite plaintiff's (and perhaps counsel's) expectation that this September 28 memo would rise to the level of protected activity,[14] it simply does not make it.  Rather, it is a request for medical leave, which plaintiff also happened to submit as evidence to support her workers' compensation claim.  In other words, the purpose of the memorandum was purely to advance her self-interest, rather than to voice any opposition to a discriminatory employment practice or an attempt to vindicate the rights of racial minorities.  Moreover, the conclusion that the memorandum was not submitted in opposition to discriminatory practices at RB is buttressed by an October 22, 2001 memorandum that plaintiff sent to Martens, recapping a meeting the two had upon her return to work.  (Welzel Dep., Ex. 42.)  In it, she wrote that Martens had "affirmed that the company does not discriminate, and that we have a very diverse work culture."  (*Id.*)  Plaintiff further indicated that "I feel there are no changes to be made on my part, and I anticipate that there will be no changes on your or the company's part."  (*Id.*)

---

[14] On September 27, 2001, plaintiff sent an e-mail to Pastoor, who was no longer employed at RB at the time, in which she informed him of her intention to file the request for medical leave together with a letter to Martens explaining "how the 'work environment' has contributed to my health problems."  (Welzel Dep., Ex. 27.)  Plaintiff wrote that Martens "will blow his top, and there's not much he can do about it.  He'll have to grant my leave . . . and if he fires me, it screams retaliation."  (*Id.*)

**D.     June 17, 2002**

In early June 2002, Martens went into plaintiff's office, provided her with a copy of the

*Washington Business Journal*, and inquired why RB had not been included in the article

regarding human resources.[15]  (Pl.'s Stmt. ¶ 240; Welzel Dep. III at 147.)  In a memorandum

dated June 17, 2001, plaintiff responded to Martens' inquiry.  (Pl.'s Ex. 1133.)  Implicitly

contrasting RB with the companies cited in the article, plaintiff wrote that, among other things,

all of the companies "**VALUE EVERY EMPLOYEE**," "seek out and welcome **DIVERSITY**,"

"**involve their employees** in decision-making," "**inform their employees** about all aspects of the

company," "offer **REAL BENEFITS**," "see a **value in training**," and generally "understand and

appreciate the value of their ***greatest commodity – their people.***"  (*Id.* (emphasis in original).)

Plaintiff further commented that "[f]or those companies that have more than one location, they

have an HR person situated at every location so that the employees have a consistent, reliable

source for benefit and policy administration."  (*Id.*)  And finally, plaintiff noted that:

> These are companies that make **ethical hiring, promotion and firing
> decisions**.  These are companies that know the Federal, State and
> local employment laws, Department of Labor regulations, Wage and
> Hour laws, ***and fully comply wih all of them.***  These are companies
> that listen to and depend upon their Human Resources professional

---

[15] The parties dispute the manner in which Martens gave the journal to plaintiff.  (*See, e.g.*, Defs.' Statement of Fact in Opposition to Pl.'s Statement of Material Fact Not in Dispute in Support of Pl.'s Cross-Motion for Partial Summary Judgment ¶¶ 240, 242.)  Plaintiff testified that she "truly was afraid that he was going to hit me with the magazine" (Welzel Dep. III at 149) because Martens "threw it across my desk . . . like a frisbee . . . and it kind of slid across my desk." (*Id.* at 147-48.)  Plaintiff argues that Martens' action "was an extreme act of hostile work environment."  (Pl.'s Opp'n at 30.)  Martens, of course, denies throwing the journal at plaintiff.  (Martens Dep. III at 505.)  This factual dispute is immaterial, however, because plaintiff has not raised a hostile work environment claim, nor is there any reason to believe that this incident would qualify as a hostile work environment claim, as opposed to "a simple lack of good manners."  *White*, __ U.S. __ , 2006 WL 1698958, at *10.

to guide and advise them along these difficult routes.  These are companies that see their H.R. professional as a member of the Executive Team, who is kept informed and helps make decisions regarding the success of employees and ultimately of the company.

(*Id.* (emphasis in original).)[16]

Plaintiff argues that the submission of her memorandum to Martens constitutes protected activity under both Title VII and § 1981 because she was "defend[ing] her role upholding the employment laws and equal employment opportunity" at RB.  (Pl.'s Opp'n at 26.)  Again, the Court disagrees.  First of all, nowhere in the memorandum does plaintiff even address her role with respect to RB's compliance with applicable employment laws.  Instead, the memorandum consists of generalized complaints about her employer and, at most, an unsupported suggestion that RB has failed to comply with applicable employment laws.  The memorandum does not, however, identify a single instance of discrimination or any specific racially discriminatory practice on the part of RB or any individual defendant.  As such, plaintiff has not demonstrated a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII or that she was attempting to vindicate the § 1981 rights of racial minorities.  Therefore, this memorandum does not constitute protected activity under either Title VII or § 1981.

### E.    January 18, 2003

In a January 18, 2003 memorandum to Sherman, which was copied to Martens, plaintiff expressed concerns that she had regarding Sherman's decision to layoff four kitchen staff,

---

[16] Although plaintiff characterizes her June 17, 2002 memorandum as "a memo to Martens to protest his throwing the *Washington Business Journal* at her on 6/14/02" (Pl.'s Opp'n at 26), the memorandum fails to even mention any throwing of the magazine at her.  To the contrary, plaintiff opens the memorandum by thanking Martens for giving her the journal.  (Pl.'s Ex. 1133.)  But now, plaintiff conveniently claims that she "was physically afraid that he was going to hit [her] with the magazine."  (Welzel Dep. III at 148-49.)

including two Hispanics, at the Morrison Clark Inn.  (Pl.'s Ex. 1140.)  Plaintiff noted that she

had only learned of the decision 15 minutes prior to the staff members being informed of their

lay-offs.  (*Id.*)  As a result, she had been unable to advise management regarding certain liability

risks, which "could have been eliminated" if she had been "brought into the loop" earlier.  (*Id.*)

In particular, plaintiff noted that two of the individuals, who were Hispanic and had shown

substantial loyalty to the company by having a combined total of over 24 years of service, fell

under the "protected class" as defined by EEO guidelines.  (*Id.*)  She was also concerned about a

disparity in the salaries of two of the staff members, and the fact that the four individuals had

been informed of their lay-offs in a group setting, rather than individually.  (*Id.*)  Plaintiff noted

that the latter practice "reduces the possibility that they will walk out of the meeting together and

one of them says, 'I know a good lawyer.'" (*Id.*)  She also recommended meeting again with one

of the laid-off workers to offer her another position within the company.  (*Id.*)

 Plaintiff's actions do not constitute protected activity under either Title VII or § 1981.

She did not allege that any of the four kitchen staff members were laid off because of their

ethnicity or for any other discriminatory reason, or that RB was engaging in any practice made

unlawful by Title VII.  Therefore, plaintiff was not opposing such practices by RB and could not

have been vindicating the § 1981 rights of racial minorities.  Indeed, plaintiff was merely

performing her duty as RB's Director of Human Resources by advising management regarding

possible risks and counseling management regarding ways to eliminate or mitigate such risks in

the future.

The Court therefore concludes that with the exception of filing an EEO complaint on

March 7, 2003, plaintiff's argument that the prior five incidents constituted protected activity

must be rejected.  Whether one applies § 1981 or Title VII, the result would be the same, for the facts as presented by plaintiff do not provide her with a basis for invoking § 1981 and she had no objectively reasonable good faith belief that she was opposing an employment practice that was unlawful under Title VII.

The Court must now, however, turn to defendants' arguments regarding plaintiff's termination, which came three days after plaintiff admittedly engaged in protected activity when she participated in an EEOC proceeding by filing an EEO complaint.  *See Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 42-43 (2d Cir. 1984) (filing EEO complaint alleging racial discrimination is protected activity under § 1981); *Hollbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (filing EEO complaint is protected activity under Title VII).

## V.   Plaintiff's March 10, 2003 Termination

In challenging plaintiff's claim that she was terminated in retaliation for her protected activity, defendants claim that plaintiff cannot, as a matter of law, make out a prima facie case under Title VII because there was no causal link between her termination and the November 2000 incident given the lack of temporal proximity, or in the alternative, the March 7, 2003 EEO complaint did not cause the termination, since defendants had already decided to terminate plaintiff due to her poor performance.  (*See* Defs.' Mem. at 20; Defs.' Reply at 24-25.) Moreover, according to defendants, even if plaintiff could arguably make out a prima facie case, her claim must be rejected because defendants had a legitimate, non-discriminatory reason for her termination, and plaintiff has proffered no evidence of pretext.  (*See* Defs.' Mem. at 21-24.)[17]

---

[17] As previously explained, plaintiff has no claim under § 1981, since she is complaining about a vindication of her civil rights and not those of a racial minority.  She does, however, have a viable Title VII claim that was timely filed.

Before turning to these arguments, it is necessary to review the relevant events that led up to plaintiff's March 10, 2003 termination.  As of June 2002, plaintiff began to report directly to Sherman, who had been elevated to Pastoor's former position of Vice President and Director of Hotel and Restaurant Operations during a reorganization of RB's hotel management and operations.  (Defs.' Stmt. ¶¶ 124, 125; Welzel Dep., Ex. 45.)  But as early as January 2003, Sherman became dissatisfied with plaintiff's performance, and on January 30, 2003, he informed her that "based on the information I gathered and on my own observation and experiences, I decided to postpone a performance review for 90 days."  (Welzel Dep., Ex. 46.)  He told her that if he went ahead with her review at that time, it would not be favorable.  (*Id.*)  Specifically, Sherman listed nine reasons why he considered plaintiff's work deficient and asked her "to come up with a plan based on these points to turn your situation around so that you can receive a favorable review."  (*Id.*)[18]

Plaintiff was scheduled to meet with Sherman on February 7 to discuss the issues he had raised in his January 30, 2003 memorandum.  However, she canceled the meeting the day before because "she was not prepared to meet with him at that time."  (Welzel Dep. II at 78-79; Welzel Dep., Ex. 47.)  Plaintiff and Sherman met on February 19, but again plaintiff did not provide Sherman with an action plan at this meeting, so the two agreed to reschedule for February 26 to discuss plaintiff's plan.  (Welzel Dep., Ex. 49.)  On February 25, plaintiff sent Sherman a memorandum informing him about the November 22, 2000 incident.  (Welzel Dep., Ex. 48.)

---

[18] Among the deficiencies Sherman identified was plaintiff's failure to create "a plan for the development or training of either line employees or management," her "hostile or abrasive attitude to senior management in the hotels," and the general "lack of support" that plaintiff offered to the general managers and the company as a whole.  (*See* Welzel Dep., Ex. 46.)

This was the first time that plaintiff had mentioned the incident to Sherman.  (Welzel Dep. II at

127.)  In the memorandum, plaintiff also made generalized allegations of additional illegality and

non-compliance at RB.  Although plaintiff's memorandum was not the action plan that Sherman

had requested, and it did not respond to the nine performance issues raised by Sherman on

January 30, 2003, plaintiff refused to meet with Sherman to discuss *his* memorandum until he

addressed *her* February 25 memorandum.  (*See id.* at 99; Pl.'s Ex. 1120.)

On February 26, 2003, Sherman sent plaintiff a memorandum in which he informed her

that he was unaware of any discriminatory or illegal practices at RB and asked her, as Director of

Human Resources, to provide him with specific examples of such practices.  (Welzel Dep., Ex.

50.)  Sherman also expressed his concern regarding plaintiff's attitude, her refusal to meet with

him, and her refusal to provide him with the action plan that he requested on January 30, 2003.

Plaintiff and Sherman met the following day, but plaintiff persisted in not providing Sherman

with an action plan or a list of discriminatory or illegal practices.

On March 5, 2003, plaintiff wrote Sherman another memorandum.  (Welzel Dep., Ex.

52.)  Plaintiff admits that the memorandum did not include a list of discriminatory or illegal

practices as Sherman had requested on February 26 or the plan that he requested on January 30.

(Defs.' Stmt. ¶¶ 155, 156.)

On March 7, 2003, plaintiff met with Sherman and gave him a memorandum that

purported to be her plan in response to his January 30 memo.  (Welzel Dep., Ex. 54.)

Nevertheless, plaintiff admits that she *never* provided Sherman with a list of discriminatory or

illegal practices at RB.  (*See* Welzel Dep. II at 115-16, 118; Welzel Dep. III at 202-03.)

According to Sherman, plaintiff's memorandum was not an adequate action plan and

demonstrated plaintiff's unwillingness to address the performance issues he identified.  (*See* Welzel Dep., Ex. 55.)  In fact, plaintiff's memorandum concluded – in response to Sherman's inquiry whether plaintiff wished to remain in the job – that RB "does not understand what the role and value of Human Resources is to its success" and that plaintiff still thought she could make a difference, just "maybe not at this company."  (Welzel Dep., Ex. 54.)  At the end of plaintiff's meeting with Sherman on March 7, 2003, she informed him that she had filed an EEOC charge earlier that day.  (Defs.' Stmt. ¶ 171.)  Thereafter, Sherman told Martens that he did not want to be "blackmailed" by plaintiff's filing of an EEO complaint, so he proceeded with his decision to terminate her on March 10, 2003.  (Sherman Dep. at 134-35, 150, 159-60.)  In her complaint, plaintiff asserted, *inter alia*, that she was being retaliated against as a result of the November 2000 meeting.  (First Amended Compl., Ex. 6.)

There are, however, several problems with plaintiff's termination claim.  First, given the over two-year time lapse between the November 2000 meeting and the March 2003 termination, there is no causal link between these two events.  *See*, *e.g.*, *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1121 (10th Cir. 2005) (six-month period between protected activity and adverse action insufficient to show causal relationship); *Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir. 2005) (ten-month period between protected activity and adverse action "tends to evaporate" any causal nexus); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (one-year lapse between protected activity and adverse action too long to allow reasonable fact-finder to infer causal relationship).  But more importantly, the record clearly supports defendants' argument that Sherman had come to the conclusion that plaintiff should be terminated prior to his meeting with plaintiff on March 7, and that he had even gotten authority from Martens to fire her

prior to being informed of her filing an EEO complaint.  (*See* Sherman Dep. at 128-37.)  Given

his identification in January of a myriad of performance issues[19] and plaintiff's refusal in

February and March to even address those deficiencies or to comply with his requests, Sherman

made up his mind that plaintiff would have to go, and this decision was reached prior to his

hearing of plaintiff's filing of an EEO complaint.  (*See id.*)

While undoubtedly plaintiff again believed that by filing an EEO complaint, she could

insulate herself from being fired (or at the least, she could pursue a claim for retaliation (*see* note

14, *supra*)), that is not the law.  Under Title VII, an employee who is being criticized for

performance issues may not refuse to address these issues, and instead, file a Title VII action in

an obvious attempt to immunize herself from any adverse action.  *See Carter v. Greenspan*, 304

F. Supp. 2d 13, 31 (D.D.C. 2004) ("Filing a Title VII action . . . is meant to shield employees

from the discriminatory actions of their employers, not to excuse an employee's poor job

performance, impudence, or insubordination." ) (citation omitted).  Nor can a plaintiff make out a

prima facie case of retaliation when the employer was preparing to terminate her before she filed

her charge.  *See Horne v. Reznick, Fedder & Silverman*, No. 05-1025, 2005 WL 3076921, at *3

(4th Cir. Nov. 17, 2005) (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir. 1997)

("[S]ince . . . [the defendant] was preparing to discharge [the plaintiff] before [the plaintiff]

contacted any of the civil rights offices, it is not a permissible inference that [the plaintiff] was

discharged because he contacted those offices.")); *Carter*, 304 F. Supp. 2d at 30 ("Because

[plaintiff's] supervisors' dissatisfaction with his performance and their intentions to terminate

---

[19] According to plaintiff's affidavit in support of her EEO complaint (Welzel Dep., Ex.
57), she had been put on probation in January because of her performance problems.

him predated his protected activity, his retaliatory discharge claim is illogical and must be dismissed."); *Trawick v. Hantman*, 151 F. Supp. 2d 54, 63 (D.D.C. 2001), *aff'd*, No. 01-5309, 2002 WL 449777 (D.C. Cir. Feb. 21, 2002) (because the termination process had already been initiated, no reasonable juror could conclude that the termination had been caused by the EEO activity).

For these reasons, plaintiff cannot establish a prima facie case of retaliation under either Title VII or § 1981.  Accordingly, summary judgment is entered as to her termination claim.

## CONCLUSION

For the reasons presented above, the Court grants defendant's motion for summary judgment, denies plaintiff's cross-motion for partial summary judgment, and dismisses the above-captioned complaint.  A separate Order accompanies this Memorandum Opinion.


_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge


Date: July 6, 2006